UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DAWN JARVIS,

      Plaintiff,

vs.                                             Case No.: 3:21cv253/MCR/ZCB

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Dawn Jarvis brings this action under 42 U.S.C. § 405(g) seeking judicial review of the Social Security Commissioner's final decision denying her claim for disability insurance benefits. Because the Commissioner's decision is supported by substantial evidence, the undersigned respectfully recommends that it be affirmed.

### I.    Procedural History

Plaintiff first applied for disability insurance benefits on October 17, 2018, alleging an onset date of August 21, 2018. (Tr. 84, 191).[1] Her date last insured was

---

[1] Citations to the administrative record filed by the Commissioner are designated as "Tr." The page numbers cited herein are those found on the bottom right corner of each page of the transcript.

September 30, 2019. [2]  (Tr. 19, Finding 1).  The Social Security Administration (SSA) initially denied her claim on January 3, 2019, and again on reconsideration on April 3, 2019.  (Tr. 17, 76-83, 89-98).  Plaintiff requested a hearing before an Administrative Law Judge (ALJ), which was held on June 29, 2020.  (Tr. 38-74). On August 26, 2020, the ALJ found Plaintiff was not disabled on or before her date last insured.  (Tr. 17-29).  The Appeals Council denied Plaintiff's request for review. (Tr. 1-5).  The ALJ's decision now stands as the final decision of the Commissioner, and Plaintiff has timely requested judicial review under 42 U.S.C. § 405(g).

## II.    The Legal Framework

"Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). The SSA has established a five-step sequential process to determine whether a claimant is disabled.  *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004); 20 C.F.R. § 404.1520(a)(4).

First, the Commissioner must determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  If so, the Commissioner

---

[2] To succeed on a disability insurance benefits claim, a claimant must show that she became disabled on or before the date last insured.  *See* 42 U.S.C. §§ 416(i)(3), 423(a), (c); 20 C.F.R. §§ 404.101, 404.130, 404.131.

will find that the claimant is not disabled.  20 C.F.R. § 404.1520(b).  Second, if the claimant is not engaged in substantial gainful activity, then the Commissioner will determine the severity of the claimant's impairments or combination of impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  To be disabled, a claimant must have a "severe impairment," which is an impairment that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).

Third, the Commissioner evaluates whether the claimant's severe impairment meets or equals an impairment listed in Appendix 1 to subpart P of Part 404 of the regulations (the "Listing").  20 C.F.R. § 404.1520(a)(4)(iii).  Fourth, the Commissioner determines whether the claimant's residual functional capacity can meet the physical and mental demands of past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Fifth and finally, the Commissioner determines whether the claimant's residual functioning capacity, age, education, and past work experience prevent the performance of any other work in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).

The claimant bears the burden of proof at the first four steps.  *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1278 (11th Cir. 2020).  If the claimant establishes the first four steps, then the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy that the claimant can perform.  *Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1321 (11th

Cir. 2021). If the Commissioner carries this burden, then the claimant must prove that she cannot perform the work identified by the Commissioner. *Goode*, 966 F.3d at 1279.

### III.    The ALJ's Decision

Here, the ALJ found that Plaintiff had not engaged in substantial gainful activity from her onset date of August 21, 2018, through her date last insured of September 30, 2019. (Tr. 19, Finding 2). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: "lupus, migraines, anxiety, depression, bilateral hearing loss, left eye blindness, left arm disorder, neck disorder, and alleged breathing disorder due to tracheal scarring." (Tr. 19, Finding 3). At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20, Finding 4).

The ALJ then found that Plaintiff had the residual functioning capacity to perform sedentary work as defined under 20 C.F.R. § 404.1567(a), with the following additional limitations:

> [C]laimant can occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. The claimant can frequently handle and finger bilaterally. The claimant's ability to understand, remember, and apply information and concentrate, persist, and maintain pace is limited to performing simple and routine tasks and some detailed instructions consistent with reasoning level one through three occupations; she can interact with supervisors, coworkers, and the public occasionally; and

she can deal with occasional changes in a routine work setting. She can work in a moderate noise environment and would not be able to perform any jobs that require depth perception.

(Tr. 21, Finding 5). At step four, the ALJ found that, based on Plaintiff's residual functioning capacity, she was unable to perform her past relevant work as a grocery checker, sales floor member, day care worker, office clerk, and cashier. (Tr. 27-28, Finding 6). Finally, the ALJ found at step five that given Plaintiff's age, education, work experience, and residual functioning capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 28, Finding 10). Relying on testimony by a vocational expert, the ALJ found that Plaintiff could work as an order clerk, pager, and stuffer. (Tr. 29). Based on these findings, the ALJ concluded that Plaintiff was not disabled from August 21, 2018, (the alleged onset date) through September 30, 2019 (the date last insured). (Tr. 29, Finding 11).

## IV.    Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's findings, and whether the correct legal standards were applied. *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). Thus, it is not this Court's role to "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1104 (11th

Cir. 2021) (cleaned up).  Indeed, the Social Security Act provides that "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C § 405(g) (cleaned up); *Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998).

The substantial evidence standard is "not high."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  It requires "more than a mere scintilla, but less than a preponderance."  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam) (internal quotations omitted).  Put another way, it requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek*, 139 S. Ct. at 1154 (internal quotation omitted).  And, "[i]f the Commissioner's decision is supported by substantial evidence, we must affirm, even if the proof preponderates against it."  *Phillips*, 357 F.3d at 1240 n.8 (internal quotations omitted).

## V.    Summary of Relevant Medical Evidence

Plaintiff's impairments stem from a severe car accident in 2000.  (Doc. 14 at 1); (Tr. 22, 531).  The injuries Plaintiff sustained from the accident required an emergency cricothyrotomy[3] at the scene, which was converted to a tracheostomy

---

[3] A cricothyrotomy is an "[i]ncision through the skin and cricothyroid membrane for relief of respiratory obstruction; used before or in place of tracheotomy in certain emergency respiratory obstructions."  *Cricothyrotomy*, *Stedman's Medical Dictionary*, Westlaw 213390 (Nov. 2014)

6

that Plaintiff kept for two years.[4]  (Tr. 22, 531).  These tubes from the cricothyrotomy and tracheotomies caused her to develop a tracheocutaneous fistula[5] and subglottal stenosis.[6]  (Tr. 22, 531).  Plaintiff also suffered from a deformity of the left sinus and a retention cyst from her facial surgeries, causing nasal obstruction.  (Tr. 401, 538-40).  She was left with permanent brain damage, as well as partial blindness and deafness.  (Tr. 358-59, 374, 376-77).

Despite these injuries, Plaintiff successfully worked for almost twenty years. Her jobs included working as a cashier, overnight stocker, and daycare worker.  (Tr. 214-17, 234).  She filed for disability in 2018, claiming that her medical complications originating and/or developing from her injuries sustained in the 2000 car accident render her disabled.  In her application for benefits, Plaintiff alleged she was disabled due to depression, anxiety, "70% airway," deaf left ear, blind left eye,

---

[4] Plaintiff also required several months of hospitalization and numerous surgeries, including three craniotomy surgeries and several surgeries to repair her left arm and face. (*See* Tr. 374, 376-77, 433, 437, 531).

[5] Plaintiff's "tracheocutaneous fistula" is an abnormal connection between the trachea and the esophagus. *Tracheoesophageal Fistula*, *Stedman's Medical Dictionary*, Westlaw 337160 (Nov. 2014).  It "forces air into the esophagus during expiration to produce a sound.  If the valve misfunctions, fluids and food may be aspirated into the tracheobronchial tree." *The Merck Manual* 695 (Mark H. Beers, M.D. & Robert Berkow, M.D. eds., 17th ed. 1999).

[6] "Subglottal stenosis" is a narrowing of the airway below the vocal cords. Ida G. Dox et al., *Attorney's Illustrated Medical Dictionary* S64, S75 (West 1997) (see "steno-" & "subglottic").

7

a metal plate in her head, "70% airway in lungs," hearing aid in her right ear, crushed left elbow, and tendinitis in her left hand.  (Tr. 222).

Plaintiff began seeing her primary care provider, Edward Schuka, M.D., on March 27, 2018.  (Tr. 393).  In her initial visit with Dr. Schuka, Plaintiff complained of worsening fatigue, especially during the day.  (*Id.*).  Dr. Schuka determined she had chronic fatigue, history of traumatic brain injury, tracheal scarring, and depression.  (Tr. 394).  Dr. Schuka also noted that Plaintiff used an inhaler on an "as needed" basis for her tracheal scarring.  (Tr. 393).  At Plaintiff's follow-up appointment two weeks later, Dr. Schuka referred her to a pulmonologist for evaluation of possible sleep apnea and scar tissue build up.  (Tr. 390-91).

Plaintiff saw pulmonologist Charles Bryan, M.D. on April 26, 2018.  (Tr. 605).  Dr. Bryan noted that Plaintiff had not been evaluated for her tracheal issues in ten years.  (*Id.*).  Plaintiff complained to Dr. Bryan that she recently noticed excessive daytime drowsiness and fatigue, got short of breath when talking, fell asleep easily, and was known to snore.  (*Id.*).  Plaintiff also reported to Dr. Bryan that she had never been diagnosed with COPD or asthma.  (*Id.*).  She denied difficulty breathing at night, difficulty breathing on exertion, coughing up blood, and wheezing and night sweats.  (Tr. 606).  After conducting a physical examination, Dr. Bryan stated that Plaintiff has signs and symptoms of uncontrolled obstructive sleep

apnea. (Tr. 608). He ordered a function test with a flow volume loop and a screening test for obstructive sleep apnea. (*Id.*). He told Plaintiff to return in two weeks. (*Id.*).

Plaintiff underwent a pulmonary functioning test (PFT) on May 3, 2018. (Tr. 620). Her PFT showed moderate to severe obstructive physiology with mild air trapping and normal gas exchange. (*Id.*). During her follow-up appointment on May 23, 2018, Dr. Bryan noted that the spirometry[7] confirmed that Plaintiff has moderate airflow obstruction. (Tr. 602). He also noted that Plaintiff did not present with stridor[8] the day of the examination, but that "she does have a history of subglottic stenosis complicating a previous trach." (*Id.*). Dr. Bryan also reported that her home sleep apnea test was negative for significant obstructive sleep apnea. (Tr. 602-603). At this appointment, he diagnosed her with COPD "unspecified." (Tr. 603). He recommended she continue to use her prescribed Breo inhaler and her rescue inhaler as needed. (*Id.*). Dr. Bryan also referred Plaintiff to an Ear, Nose, and Throat specialist, Adam Holdt, M.D., to evaluate her upper airway. (*Id.*).

Plaintiff had another appointment with Dr. Bryan on September 25, 2018. (Tr. 593). At the appointment, Plaintiff told Dr. Bryan that she had no recent

---

[7] A spirometry test measures "the air entering and leaving the lungs (as in determining lung function in the diagnosis of pulmonary disease)." *Spirometer*, *Marriam-Webster*, https://www.merriam-webster.com/dictionary/spirometry (last visited July 5, 2022); *see also* J. Stanley McQuade, *Reading Medical Records* §§ 9:19, 9:27 (2nd ed. 2012).

[8] Stridor is an abnormal lung sound caused by a spasm of the vocal cords and tends to be inspiratory in timing. McQuade, *supra* note 10, at § 9:36.

exacerbation or cough but she did get dyspneic while talking. (*Id.*). Dr. Bryan's notes for this visit state:

> Spirometry confirms the patient has moderate airflow obstruction severe small airways disease. I reviewed the flow volume loop ended peers show a variable intrathoracic obstruction consistent with her history of subglottic stenosis. She does appear to have good residual airflow. Her home sleep test is negative for significant obstructive apnea. Patient has some independent airflow obstruction especially in small airways independent of her subglottic stenosis. She has noticed some improvement on Breo but her insurance will no longer cover that maintenance inhaler.

(Tr. 596). Dr. Bryan prescribed Plaintiff a new inhaler to replace her Breo and told her to continue her rescue inhaler as needed. (Tr. 597).

## VI.    Discussion

On appeal, Plaintiff argues the ALJ failed to meaningfully analyze the effects of her severe small airway disease and COPD on her residual functional capacity.[9] In doing so, she alleges that the ALJ mischaracterized relevant medical evidence related to her pulmonary impairments, including falsely stating that she has never been diagnosed with COPD. She also contends that the ALJ improperly disregarded the medical opinions of SSA medical expert, Janis E. Eiler, M.D., and her primary care physician, Dr. Schuka.

---

[9] Although Plaintiff has a variety of medical issues, her appeal challenges only the the ALJ's consideration of her small airway disease and COPD. (Doc. 14 at 4).

*A. The ALJ's analysis of Plaintiff's pulmonary impairments*

Plaintiff contends that the ALJ ignored her pulmonologist's diagnosis of COPD and went so far as to falsely find that she had never been diagnosed with COPD.[10] (Doc. 14 at 4). In his recitation of Dr. Bryan's notes from April 26, 2018, the ALJ wrote: "She has never been diagnosed with COPD or asthma." (Tr. 22). Contrary to Plaintiff's assertion, the ALJ did not err by including this statement in his written decision. This statement came verbatim from Dr. Bryan's notes summarizing Plaintiff's past medical history. (Tr. 376) ("She has never been diagnosed with COPD or asthma.").

Moreover, the ALJ went on to discuss all of Dr. Bryan's treatment notes, including those that confirmed moderate airflow obstruction and severe small airway disease. (Tr. 22-23). Indeed, the evidence Plaintiff cites in support of her claims that her COPD symptoms are disabling was discussed by the ALJ. (*See* Doc. 14 at 7-9; Tr. 22-23). The ALJ limited Plaintiff to sedentary work based in part on Dr. Bryan's medical findings. (Tr. 23). Thus, while not naming COPD explicitly, the ALJ acknowledged pulmonary issues and relied on them in assessing Plaintiff's

---

[10] It is undisputed that Plaintiff was diagnosed with COPD. (Tr. 603). The material question on appeal, however, is what functional limitations result from Plaintiff's COPD or other pulmonary impairments. A diagnosis alone does not answer the question of what functional limitations Plaintiff has as result of that diagnosis. *See Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005) ("[T]he mere existence of these impairments does not reveal the extent to which they limit [a claimant's] ability to work or undermine the ALJ's determination in that regard.").

residual functioning capacity.[11]  (*Id.*) ("These limitations account for any fatigue, dyspnea, shortness of breath, and wheezing related to this condition that may be induced by exertion and positional activities.").  The ALJ discussed Dr. Bryan's findings regarding the pulmonary function test, as well as the medications Dr. Bryan prescribed Plaintiff for her breathing issues.  (*Id.*).  Given that the ALJ considered and discussed Plaintiff's respiratory issues, his failure to specifically state that Plaintiff had been diagnosed with COPD does not warrant remand.

Similarly, the ALJ's use of the words "alleged" and "subjective" when describing Plaintiff's breathing impairments does not warrant remand.  Plaintiff claims these words reflect a misunderstanding of her pulmonary impairments and

---

[11] Even if the ALJ mistakenly attributed Plaintiff's pulmonary symptoms to tracheal scarring, he nevertheless still considered the functional limitations resulting from COPD and any other pulmonary impairments in assessing the residual functioning capacity.  There is no reason to believe the outcome would have been different had the ALJ linked Plaintiff's pulmonary issues to a diagnosis of COPD, given that the ALJ thoroughly considered Plaintiff's pulmonary issues and symptoms—none of which would have been different had the ALJ specifically noted Plaintiff's COPD diagnosis.  *See generally Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (finding that ALJ's misstatement was harmless error in context of the case); *see also Stockton v. Comm'r of Soc. Sec.*, No. 6:20-cv-1249, 2022 WL 562347, at *5 (M.D. Fla. Feb. 24, 2022) (refusing to remand because ALJ's erroneous statement that there were no EMG findings in the record was harmless because it did not impact the final decision and a "single erroneous statement by the ALJ alone may not require remand"); *Senn v. Colvin*, No. 3:11-cv-467, 2014 WL 4655432, at *3 (M.D. Ala. Sept. 16, 2014) (finding that any error by the ALJ in describing a neurological exam as normal was harmless given the remainder of the evidence supporting the ALJ's determination).

reflect a bias or problematic conclusion regarding her credibility.  (Doc. 14 at 7).

But that argument fails upon consideration of the ALJ's explanation and highly

restrictive residual functioning capacity.  It is apparent that the ALJ found Plaintiff

to be suffering from pulmonary impairments because he limited her to sedentary

work in part because of those pulmonary impairments.  (*See* Tr. 23).  There is

nothing in the record to support Plaintiff's claim that the ALJ's use of the word

"alleged" reflects any bias on the part of the ALJ.

Plaintiff also challenges the ALJ's recitation of Dr. Bryan's findings regarding

stridor.  In summarizing Dr. Bryan's notes from May 23, 2018, the ALJ stated that

Plaintiff "did not have stridor on exam that day."  (Tr. 22).  Plaintiff claims that the

ALJ improperly found that she did not exhibit stridor during the May 23rd exam,

and that Plaintiff exhibited stridor at all three exams with Dr. Bryan.  (Doc. 14 at 7-

8).  While Dr. Bryan's physical examination notes do show that Plaintiff exhibited

"mild stridor transmitted from neck," he later wrote that Plaintiff did "not have

stridor today" under a different section in his treatment note.  (Tr. 601-602).  As with

the ALJ's earlier statement regarding Plaintiff's COPD, the ALJ recited Dr. Bryan's

notes when summarizing Plaintiff's May 23rd visit and writing that she had no

stridor that day.  (Tr. 22).  The ALJ did not err by reciting what was stated in Dr.

Bryan's notes.

The ALJ limited Plaintiff to sedentary work with postural limitations to "account for any fatigue, dyspnea, shortness of breath, and wheezing related to [her breathing disorder] that may be induced b[y] exertion and positional activities." (Tr. 23). He found no further limitations were warranted because the physical exams generally showed clear lungs, and Plaintiff had responded well to daily and as needed medications. (*Id.*). There is substantial evidence to support this finding. *See, e.g.*, (Tr. 378, 382, 385, 388, 476, 479, 483, 601). Plaintiff's pulmonary function tests showed moderate to severe obstruction (which, her pulmonologist interpreted as only moderate (Tr. 602)) with mild air trapping and normal gas exchange. (Tr. 23, 620). Other tests show 30% to 40% tracheal stenosis.[12] (Tr. 23, 531, 535, 537, 538, 540).

Unlike many of the cases cited by Plaintiff, the ALJ discussed the medical evidence that Plaintiff claims underlies her COPD and small airway disease diagnosis. The ALJ may not have specifically referred to every piece of evidence when explaining his decision, but such an exhaustive chronicling of each piece of evidence is not required. The Eleventh Circuit's decision in *Mitchell v. Commissioner, Social Security Administration* is instructive here. 771 F.3d 780, 782 (11th Cir. 2014). In *Mitchell*, the plaintiff argued that the ALJ ignored evidence

---

[12] Tracheal stenosis refers to an "abnormal narrowing or constriction of the trachea (windpipe)." 4 J.E. Schmidt, M.D., *Schmidt's Attorneys' Dictionary of Medicine* T-108 (Matthew Bender 1986) (see "tracheostenosis").

favorable to the plaintiff. *Id.* The Eleventh Circuit rejected the plaintiff's argument, recognizing "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is not enough to enable [a reviewing court] to conclude that the ALJ considered [the claimant's] medical conditions as a whole." *Id.* (internal quotations omitted).

In the current case, the ALJ devoted nearly a paragraph to each visit Plaintiff made to her pulmonologist. (Tr. 22-23). This shows that he considered and discussed the medical evidence in his residual functioning capacity assessment. The ALJ's decision in this case was not a broad rejection of evidence related to Plaintiff's COPD and small airway disease. The ALJ's discussion of Plaintiff's pulmonary issues is sufficient to enable this Court to conclude that the ALJ considered Plaintiff's medical condition in determining whether her breathing impairments caused functional limitations and then accounted for those functional limitations in assessing her residual functioning capacity.[13] *See Mitchell*, 771 F.3d 780.

---

[13] It bears mentioning that very little of Plaintiff's testimony at the hearing was focused on COPD and breathing issues. Instead, most of her testimony focused on non-breathing related issues like migraines, anxiety and depression, injuries to her left arm, and lupus. (Tr. 47-56). Plaintiff's brief does not challenge the ALJ's decision with respect to any of those impairments.

*B.  Dr. Eiler's opinion*

Plaintiff also argues that the ALJ disregarded Dr. Eiler's opinion on the environmental limitations in determining Plaintiff's residual functioning capacity. (Doc. 14 at 8-10).    At the ALJ's request, Dr. Eiler completed a medical source statement opining on Plaintiff's ability to do certain work-related activities on a regular and continuous basis. (Tr. 633-43).  Dr. Eiler's opinion evaluated how often Plaintiff could tolerate exposure to certain environmental conditions.  Dr. Eiler found that Plaintiff could never tolerate unprotected heights, occasionally tolerate moving mechanical parts, never perform commercial driving, frequently tolerate humidity and wetness, never tolerate dust, odors, fumes and pulmonary irritants or extreme cold, occasionally tolerate extreme heat, and frequently tolerate vibrations. (Tr. 638).  She also found that Plaintiff needed a quiet work environment. (*Id.*).  Dr. Eiler cited Plaintiff's intermittent airway obstruction, vertigo, and hearing impairments as the clinical findings supporting her assessment of these limitations. (*Id.*).

The ALJ found Dr. Eiler's opinion "somewhat persuasive," but rejected her findings of environmental limitations because they were "not supported with reasonable explanation or consistent with the medical evidence." (Tr. 27).  The ALJ further found that the medical source statement completed by Dr. Eiler was not fully consistent with Dr. Eiler's narrative statement.  (*Id.*).

16

The ALJ acted within his discretion by rejecting an agency medical consultant's opinion that he believed was inconsistent with other medical evidence. *See* 20 C.F.R. § 404.1513a (stating that ALJs are not required to adopt any prior medical findings or evidence from Federal or State agency medical or psychological consultants but must consider such evidence in accordance with the regulations); *see also Hanisee v. Comm'r of Soc. Sec.*, 797 F. App'x 449 (11th Cir. 2019) (affirming the ALJ's decision to give little weight to state agency medical consultant's opinion regarding limitations in determining claimant's residual functioning capacity); *Perkins v. Comm'r of Soc. Sec.*, 553 F. App'x 870, 874 (11th Cir. 2014) (explaining that the ALJ did not err by concluding that a non-treating physician's opinion was "not entitled to significant weight").

Even if the ALJ included every environmental limitation in Dr. Eiler's opinion, Plaintiff would still be able to perform the three jobs identified by the ALJ at Step Five. The ALJ found that Plaintiff could perform the requirements of representative occupations such as order clerk (DOT 209.567-014, sedentary, SVP 2), pager (DOT 654.687-014, sedentary, SVP 2), and stuffer (DOT 731.685-014). (Tr. 29). None of these three representative occupations present any of the environmental limitations Dr. Eiler assessed in her opinion. In other words, Plaintiff can work as an order clerk, pager, or stuffer and completely avoid unprotected

heights; moving mechanical parts; dust, odors, fumes, and pulmonary irritants; and extreme cold.

### C. Dr. Schuka's opinion

Plaintiff's primary care physician Dr. Schuka completed two Treating Medical Source Opinion forms—one addressing Plaintiff's physical limitations (Tr. 421-22, 589-90) and the other addressing Plaintiff's mental limitations (Tr. 527-28). In his opinion addressing Plaintiff's physical limitations, Dr. Schuka opined that Plaintiff would have problems staying on task, avoiding absences, and maintaining concentration, persistence and pace. (Tr. 422). The ALJ found Dr. Schuka's opinion "not persuasive," explaining:

> [H]e gave no reasonable explanation for several of the limitations assigned given. Dr. Schuka's limitations regarding needing multiple unscheduled breaks daily, sitting and standing at will, and absences were not explained and his exams do not support those limitations. Dr. Schuka gave no reasonable explanation for stating she could not do "low stress work" or be off task 25%-30% of a work day. The portions of Dr. Schuka's opinions that concern issues reserved to the commissioner are not supported in any way.

(Tr. 26-27).

Plaintiff argues that the ALJ incorrectly discounted Dr. Schuka's opinion. In doing so, Plaintiff notes that Dr. Schuka referred her to a pulmonologist and was copied on all medical reports from the pulmonologist. (Tr. 597, 603, 609). Accordingly, he was aware of her COPD and severe restrictive airway disease when he gave his opinion. She argues that these conditions are known to significantly

impact a person's cognitive function with limitations similar to those found in Dr. Schuka's opinion.  (Doc. 14 at 9-10).  Plaintiff also refers to Dr. Schuka's treatment records that note her breathing problems and chronic fatigue "severely limit[] her activity levels, and inability to work [in] any stress or high-pressure environment." (Tr. 478).

Defendant, on the other hand, argues that the record does not support a finding that Plaintiff's breathing impairments caused any mental limitations.  (Doc. 15 at 16-19).  Defendant points to Plaintiff's own function report and testimony, in which Plaintiff specifically attributes her problems with concentration to her headaches, brain injury, and "paranoia"—not to her breathing problems.  (Tr. 63-67, 249). Plaintiff also claimed that strenuous activities caused her to have shortness of breath. (Tr. 252).  Defendant further argues that, if you look at Dr. Schuka's full quote from his treatment note, it is unclear which impairment causes Plaintiff's alleged inability to work with stress or in high-pressure environments.  Dr. Schuka's treatment note states in full:

> Patient's [sic] has minimal physical limitations with regard to lifting or bending, however because of traumatic brain injury and previous brain surgeries, she does have a loss of vision, loss of airway narrowing which severely limits her activity levels, and inability to work any stress or high-pressure environment.

(Tr. 478).  Additionally, Defendant argues that Dr. Schuka's opinion that Plaintiff would be off task more than 25% of the workday and would be absent multiple times a month was not supported by or consistent with the record.  (Doc. 15 at 17-18).

The ALJ is not required to accept the medical opinion of a treating physician. Indeed, for claims filed after March 27, 2017, the Social Security regulations state that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)."  20 C.F.R. § 404.1520c(a); *Matos v. Comm'r of Soc. Sec.*, No. 21-11764, 2022 WL 97144, at *4 (11th Cir. Jan 10, 2022) (explaining that the "new regulatory scheme no longer requires the ALJ to either assign more weight to medical opinions from a claimant's treating source or explain why good cause exists to disregarding the treating source's opinion").  When assessing a medical opinion—including that of a treating physician—the ALJ is to look at several factors, the most important being: (1) supportability of the medical opinion; and (2) its consistency with other evidence in the record.  *See* 20 C.F.R. § 404.1520c(c)(1)-(5); *see also Walker v. Soc. Sec. Admin., Comm'r*, No. 21-12732, 2022 WL 1022730, at *2 (11th Cir. Apr. 5, 2022) (recognizing supportability and consistency as the most important factors).[14]  Supportability refers to the principle that "[t]he more relevant the objective medical evidence and supporting explanations

---

[14] The Eleventh Circuit has held that the ALJ "may, but is not required to, explain how she considered factors other than supportability and consistency, which are the most important factors."  *Matos*, 2022 WL 97144, *4.

presented by a medical source are to support his or her medical opinion(s) or prior administrative finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1). And consistency refers to the principle that "[t]he more consistent a medical opinion(s) or prior administrative finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

The ALJ conducted the required supportability and consistently evaluation here. And he found that Dr. Schuka's opinions regarding Plaintiff's ability to stay on task, avoid absences, and maintain concentration, persistence, and pace were not supported by or consistent with the medical record. (Tr. 26-27); *see, e.g.*, *Glasby v. Soc. Sec. Admin., Comm'r*, No. 21-12093, 2022 WL 1214015 (11th Cir. Apr. 25, 2022) (finding substantial evidence supported the ALJ's finding that claimant's treating physician's opinion was not persuasive under 20 C.F.R. § 404.1520c); *Matos*, 2022 WL 97144, at *4 (affirming the ALJ's finding that claimant's doctor's opinion was unpersuasive because it was inconsistent with the record as a whole). Plaintiff points to no other evidence—other than the partial quote from Dr. Schuka's treatment note addressed above—that shows otherwise.

Even if Plaintiff's breathing impairments did cause these or similar mental limitations, the residual functioning capacity adequately accounts for such

limitations. The ALJ limited Plaintiff to "performing simple and routine tasks and some detailed instructions," occasional interaction with supervisors, coworkers, and the public, and only occasional changes in work environment. (Tr. 21). Plaintiff has not shown that the record supports additional mental limitations based on her breathing impairments. Considering the record as a whole, the ALJ's residual functioning capacity finding of sedentary work is supported by substantial evidence and his conclusion that Plaintiff was not disabled should be affirmed.

## VII.   Conclusion

For the reasons set forth above, the undersigned respectfully **RECOMMENDS**:

1. **AFFIRMING** the Commissioner's decision, **DISMISSING** this action in accordance with this order, and **ENTERING** final judgment pursuant to sentence four of 42 U.S.C. § 405(g); and

2. Directing the Clerk of Court to close the case file.

At Pensacola, Florida, this 23rd day of August 2022.

/s/ *Zachary C. Bolitho*
Zachary C. Bolitho
United States Magistrate Judge

## NOTICE TO THE PARTIES

**This case was referred to the undersigned for preliminary matters and to make recommendations regarding dispositive motions. *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b)(1)(B)-(C); Fed. R. Civ. P. 72(b).**

Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.